## Richmond

EDWARD L. GOMES, ET AL.

v.

CITY OF RICHMOND

October 5, 1979.

Record No. 780034.

Present: All the Justices.

*Parker E. Cherry (Purcell, Cherry, Kerns & Abady,* on briefs), for appellants.

*James R. Saul, Assistant City Attorney,* for appellee.

POFF, J., delivered the opinion of the Court.

On this appeal, we decide whether the City of Richmond's pay plan entitles plaintiffs,[1] rotating shift employees of various departments and agencies of the City, to a pay differential for the shifts they work at night.

In their motion for declaratory judgment, plaintiffs prayed that the trial court "construe and determine plaintiffs' rights to night differential pay under the City Ordinance and Personnel Manual" and declare that the City is "estopped from terminating" that pay. By final order entered November 4, 1977, the trial court denied plaintiffs' prayers.

Section 9:11 of the City's charter requires the City Council to enact

---

[1] Edward L. Gomes, James W. Rowe, Art L. Wyatt, Marvin L. Jesper, Charles E. Cummings, Jr., Herman Tyree, Carl G. Tuten and James Robinson.

an ordinance establishing a "pay plan [which] shall remain in effect until amended by the council". Acts 1948, c. 116. The pay plan enacted in 1949 authorized the payment of "additional compensation" to employees who "are required to perform service at night." Ordinance No. 49-30-37, § 3(a)2. The pay plan in effect at trial, substantially the same as that enacted annually since 1951, provided:

> "Whenever any employee . . . is regularly required to perform service at night, he shall receive compensation for such service [at the standard rate] plus two pay steps." Ordinance No. 75-311, § 24.

Under the 1949 ordinance, a few rotating shift employees, including primarily those "grandfathered in", received night differential pay; most did not. This disparity continued under the 1951 pay plan and all its successors. In some cases, the promise of a night differential was offered as an inducement to employment.

Section 9:03 of the City's charter and the personnel rules published by the City grant the director of personnel broad authority in the administration of the pay plan. In an effort "to establish uniform pay across the various departments", the director, assisted over a period of years by a committee of executives representing all administrative departments, developed a personnel manual which, since its publication, has contained substantially the following language:

> "Whenever a classified employee is regularly required to work at night he receives [a night differential]. This differential does not apply to employees whose shifts require them periodically to work at night, but only to those one-half or more of whose regular working hours are scheduled after 5:00 p.m."

Publication of the personnel manual failed to resolve the disparity in personnel pay practices. Some rotating shift employees, including plaintiffs, who met the working hours requirement stated in the manual continued to receive night differential pay while others were paid standard compensation. On January 12 ,1976, at the direction of the city manager, the director of personnel issued a memorandum entitled, "Restatement of Night Differential Policy". Declaring that "[r]otation shift employees were never intended to receive the differential", the memorandum instructed all department and agency heads to pay the differential to employees working "fixed night shifts" but to discontinue such payments to employees working a "rotation shift"

effective February 28, 1976. A fixed shift was defined as "one in which the regular working hours are identical each working day" and a rotation shift as "one in which the hours of work fluctuate on a regular or irregular basis".

In the prayer of their pleading, plaintiffs based their claim of legal entitlement upon their construction of the pay plan and the personnel manual and upon a theory of estoppel *in pais*. At trial, plaintiffs expressly abandoned the theories of estoppel and implied contract, and their argument invoking those theories on appeal will not be considered. The central issue is whether the trial court correctly construed the pay plan.

■ Under plaintiffs' construction, "the Pay Plan as enacted" and "the Personnel Manual implementing the Pay Plan", read separately or together, establish legislative intent to authorize night differential pay for rotating shift employees. As we read it, the pay plan, standing alone, establishes the converse.

As we have said, the 1949 pay plan authorized "additional compensation" for employees "required to perform service at night." The only construction that language fairly bears is that all employees were entitled to extra pay for any work they were required to perform at night, whether they were required to work only at night, or at night periodically on rotating shifts, or at night occasionally on call as changing circumstances might dictate. The 1951 pay plan and all its successors authorized night differential pay for employees "regularly required to perform service at night." We must determine the legislative intent underlying the addition of the word "regularly".

We cannot assume that the amendment was an act of legislative inadvertence. As a modifier of the phrase used in the old ordinance, the word "regularly" narrowed the import of that phrase. Manifestly, the purpose of the amendment was to limit the class of employees entitled to differential pay for working at night. The general rule is that "[n]on-technical words in statutes are taken to have been used in their ordinary sense and acceptation." *Board of Supervisors* v. *Boaz,* 176 Va. 126, 130, 10 S.E.2d 498, 499 (1940). In common parlance, a "regularly" employed person is one required to work every working day. Similarly, a person "regularly required to perform service at night" is one required to work at night every working day. Giving the word "regularly" its ordinary sense and acceptation in the context in which it was employed, we conclude that the City Council intended the amendment to restrict entitlement to differential pay to employees required to work at night every working day. A person employed to work rotating shifts is not such an employee.

While we do not think it necessary to consider the language of the personnel manual, we believe it reinforces the view we take of the amended language of the pay plan. It is true, as plaintiffs say, that their night shifts are pre-scheduled on a recurring basis. But those shifts are nonetheless periodic. Implementing the pay plan, the personnel manual expressly provides that the night differential pay clause "does not apply to employees whose shifts require them periodically to work at night." Obviously, rotating shift employees are such employees.[2]

■ Citing the familiar rule of construction that administrative interpretations are entitled to great weight, plaintiffs argue that the pay plan and personnel manual should be construed in accordance with the interpretations placed upon them by officials who have been "authorizing night differential pay to rotating shifts . . . thereunder for 28 years." Recognizing the general validity of the rule, we reject the argument. The maxim plaintiffs cite has little utility when, as here, different administrators interpret and apply legislative language differently.

■ Plaintiffs also rely upon a related rule of construction which holds that legislative acquiescence in administrative practices may be considered as evidence of legislative intent. They say that the director of personnel and the city manager were "central administrative officials" charged with ultimate responsibility for execution of the pay plan; that they approved the practice of paying a night differential to rotating shift employees by including such expenditures in the City's annual operating budget; and that the City Council evinced its legislative intent to authorize that practice by annually approving the budget and appropriating the necessary funds. We cannot agree that the City Council acquiesced in the practice when, as the trial court found, "the record does not disclose that [night differential payments] were identified as such for these employees and under what circumstances they would be paid."

■ Finally, plaintiffs argue that the city manager and the director of personnel had no authority to issue the January 12, 1976 memorandum. Section 9:11 of the City's charter provides that personnel

---

[2] Our view does not contradict the cases plaintiffs cite which characterize periodic employment as regular rather than "casual" employment within the intendment of workmen's compensation laws. *See, e.g., Hoffer Bros.* v. *Smith,* 148 Va. 220, 225, 138 S.E. 474, 476 (1927). In those cases, the courts applied definitions best designed to promote the particular purposes those laws were enacted to achieve, purposes distinctly different from the purpose underlying the amendment to the night differential clause of the pay plan.

compensation authorized by the pay plan cannot be "increase[d] or decrease[d]" except by legislative enactment. Plaintiffs say that their pay was decreased by administrative fiat in direct violation of that provision. We disagree. The memorandum did not decrease pay authorized by the pay plan; rather, it terminated that portion of compensation being paid rotating shift employees which was not authorized by the plan. Clearly, issuance of such a memorandum was within the authority vested in the city manager and the director of personnel to see that the provisions of the pay plan were administered in accordance with legislative intent.

We hold, therefore, that the trial court correctly ruled that rotating shift employees are not employees "regularly required to perform service at night" within the intendment of the pay plan, and we will affirm the judgment.

*Affirmed.*